# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Rebecca R. Pallmeyer | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 97 C 5402 | **DATE** | 7/25/2000 |
| **CASE TITLE** | Quadro Enterprises, Inc. vs. Avery Dennison Corporation | | |

**MOTION:** [In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due _____.

(3) ☐ Answer brief to motion due _____. Reply to answer brief due _____.

(4) ☐ Ruling/Hearing on _____ set for _____ at _____.

(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7) ☐ Trial[set for/re-set for] on _____ at _____.

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
☐ FRCP4(m) ☐ General Rule 21 ☐ FRCP41(a)(1) ☐ FRCP41(a)(2).

(10) ■ [Other docket entry] Enter Memorandum Opinion And Order. Defendant Avery's motion for summary judgment (Doc. No. 136-1) on Counts III and IV is granted.

(11) ■ [For further detail see order attached to the original minute order.]

| | | | | |
|---|---|---|---|---|
| | No notices required, advised in open court. | | 4 | **Document Number** |
| | No notices required. | | number of notices | |
| ✓ | Notices mailed by judge's staff. | | | |
| | Notified counsel by telephone. | | JUL 2 6 2000 | 175 |
| | Docketing to mail notices. | | date docketed | |
| | Mail AO 450 form. | | docketing deputy initials | |
| | Copy to judge/magistrate judge. | | 7/25/2000 | |
| | | | date mailed notice | |
| ETV | courtroom deputy's initials | | ETV | |
| | | Date/time received in central Clerk's Office | mailing deputy initials | |

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

QUADRO ENTERPRISES, INC.,
an Illinois Corporation,

      Plaintiff,

v.

AVERY DENNISON CORPORATION, a
Delaware Corporation, and STATE FARM
INSURANCE, an Illinois Corporation,

      Defendants.

AVERY DENNISON CORPORATION,
a Delaware Corporation,

      Counter-Plaintiff,

v.

QUADRO ENTERPRISES, INC.,
an Illinois Corporation,

      Counter-Defendant.

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

DOCKETED

JUL 26 2000

No. 97 C 5402

Judge Rebecca R. Pallmeyer

## MEMORANDUM OPINION AND ORDER

Between 1992 and 1995, Plaintiff Quadro Enterprises ("Quadro") supplied Defendant

State Farm Insurance ("State Farm") with printed address labels it purchased from Defendant

Avery Dennison Corp. ("Avery"). The business relationship between these three firms

soured, and Avery began to produce the label product and sell to State Farm without

Quadro's participation. Quadro has asserted five claims: copyright infringement against

Avery (Count I); (2) copyright infringement against State Farm (Count II); breach of

175

fiduciary duty against Avery (Count III); tortious interference with economic relations against Avery (Count IV); and tortious interference with economic relations[1] against State Farm (Count V). Now before the court is Defendant Avery's motion for summary judgment (Counts III and IV).[2] For the reasons stated herein, the court grants Defendant Avery's motion for summary judgment on Count III and Count IV.[3]

## FACTUAL BACKGROUND

The facts are drawn from the following documents: Avery Dennison Corporation's Rule 56.1(a)(3) Statement ("Avery's 56.1(a)(3) Stmt"); Plaintiff Quadro's Response to Avery Dennison Corporation's Rule 56.1(a)(3) Statement ("Quadro's 56.1(b)(3) Stmt."); Plaintiff Quadro's Statement of Additional Facts Pursuant to Local Rule 56.1 (b)(3)(B) ("Quadro's 56.1(b)(3)(B) Stmt."); *Quadro Enters., Inc. v. Avery Dennison Corp.*, 97 C 5402, 1997 WL 769345 (N.D. Ill. Dec. 5, 1997) (Moran, J.) ("*Quadro I*"); *Quadro Enters., Inc. v. Avery Dennison Corp.*, 97 C 5402, 1999 WL 759488 (N.D. Ill. Sept. 8, 1999) ("*Quadro II*").

---

[1] Although they are asserted within one count, Quadro's claims for "tortious interference with economic relations" actually encompass two distinct torts: tortious interference with contractual relations and tortious interference with prospective business relations.

[2] Also pending before the court are (1) Plaintiff Quadro's motion for summary judgment against Defendant Avery and State Farm regarding validity and infringement (Counts I and II) and (2) Defendants State Farm's and Avery's motion for summary judgment on copyright invalidity (Count I and Count II). Given the distinct factual background and legal issues presented by Count I and Count II, the court has chosen to address the summary judgment motions concerning those counts in a separate opinion.

[3] Defendant State Farm has not joined Defendant Avery its motion, nor has it moved separately for summary judgment on Count V.

Plaintiff Quadro Enterprises, Inc.[4] is an Illinois corporation with its principal place of business in Westmont, Illinois. (Avery's 56.1(a)(3) Stmt.) ¶ 1.) Defendant Avery Dennison is a Delaware corporation doing business in Illinois. (*Id.* ¶ 3.) State Farm Insurance is an Illinois corporation with its principal place of business in Bloomington, Illinois. (*Id.* ¶ 5.) This court has jurisdiction under 17 U.S.C. § 501, 28 U.S.C. § 1331, 1338(a) and 1338(b).

Quadro is a distributor engaged in the business of purchasing promotional products (i.e. pens, umbrellas, labels and envelopes bearing company logos) from various manufacturers and reselling them to businesses that use the products for promotional purposes. Avery manufactures adhesive labels for sale to numerous customers. (*Id.* ¶ 4.) Defendant State Farm purchases promotional labels that it makes available to State Farm insurance agents to provide to their clients. (*Id.* ¶ 6.)

In 1992, Quadro entered into a non-contractual relationship with State Farm in which Quadro purchased promotional label products from an entity referred to as Wisconsin Label and then sold those labels to State Farm. (*Id.* ¶ 9.) In the manufacturing of the State Farm labels, Wisconsin Label experienced a variety of production problems, including smearing of the imaging, adhesive pre-peeling, and excessive moisture. (*Id.* ¶ 10.) In late 1992 or early 1993, Quadro switched manufacturers and began purchasing most of the label products it sold to State Farm from Avery. (*Id.* ¶ 11.) When Quadro president Thomas Olson was asked why

---

[4]        At all times relevant to this action, Quadro Enterprises, Inc. did business under the assumed corporate names of T.J. Distributing Company and Pro Plus Company, which were and continue to be registered divisions of Quadro. (Complaint ("Compl.") ¶¶ 3, 4.)

Quadro made the switch to Avery he replied simply that "[t]he overall performance of the Avery Dennison label was better than the Wisconsin Label that had been originally manufactured." (Ex. 7 to Avery's 56.1(a)(3) Stmt., Olson Dep. at 286:11-13.)

On November 17, 1994, Avery and Quadro entered into a label sales agreement pursuant to which Avery agreed to supply Quadro with label products to be distributed to State Farm for a specified period at a specified rate. (Quadro's 56.1(b)(3) Statement ¶ 26.) The agreement, drafted by Avery, was sent by Avery to Quadro in the form of a proposal letter which began with this language:

> Pursuant to our continued conversation, the following partnership proposal is offered for your approval . . .

The letter concluded with a second reference to "partnership":

> Upon review and approval of this new partnership agreement please sign below and return the original to my attention.

(Agreement Letter, Ex. 24 to Quadro's 56.1(b)(3) Stmt.) The terms of the contract provided that it would expire on December 31, 1995. (*Id.*) Additionally, the agreement set forth an outline for a rebate program, whereby Quadro would receive rebate funds if production levels certain amounts. (*Id.*) The agreement did not provide any other details. Notably, it did not provide for any sharing of profits and losses. (*Id.*) Both parties signed and executed the agreement. (*Id.* ¶ 29.) Until the expiration of the contract, Quadro submitted purchase orders to Avery, and Avery manufactured and produced labels according to Avery's directions.

In March of 1994, Quadro entered into a contract to provide return address label

products to State Farm. (Avery's 56.1(a)(3) Stmt. ¶ 51.) This contract expired on March 1, 1996. (*Id.*) In May of 1995, State Farm entered into a second contract with Quadro for seasonal holiday return address labels. (*Id.* ¶ 52.) This contract expired on May 31, 1996. (*Id.*) Neither the March 1994 nor the May 1995 contracts expressly provided for any right or expectancy of renewal. (*Id.* ¶ 53.) Over the course of these two contracts, State Farm claims it became dissatisfied with Quadro's performance. (*Id.* ¶ 54.) Specifically, State Farm employees claim that Quadro's service was inadequate, namely that Quadro missed appointments, did not return phone calls, was late in providing requested information, and did not provide requested paper work from outside vendors. (*Id.* ¶ 56; *see also* Alexander Dep. at 60: 1-12; 135:21-137:2; *see also* Knapp Aff. ¶¶ 7-11; Miller Aff. ¶¶ 6-9.) State Farm employees testified that on one occasion Quadro delivered label products utilizing State Farm's artwork, but bearing the name of State Farm's competitor, Prudential Insurance. (*Id.* ¶ 57.) Quadro does not deny this incident occurred, but without explanation denies any responsibility for the mishap. (Quadro's 56.1(b)(3) Stmt. ¶ 57.) Lastly, State Farm employees testified that they believed Quadro's prices were "unreasonably high." (*see* Knapp Aff. ¶ 8; *see also* Miller Aff. ¶ 7; Alexander Dep. at 136: 3-14.)

On January 15, 1996, in anticipation of the expiration of its contracts with Quadro, State Farm solicited bids from several distributors and manufacturers for the return address label business. (Avery's 56.1(a)(3) Stmt. ¶ 58.) State Farm claims that at that time, it was so dissatisfied with Quadro's performance that State Farm did not want to entertain a bid from it. (*Id.* ¶ 59.) Nonetheless, for reasons left unexplained in the record, on January 25, 1996,

State Farm did request a bid from Quadro for the return address label business. (*Id.*) State Farm claims that Quadro's bid was the second highest bid it received. (*Id.* ¶ 60.) Quadro disputes this fact but fails to provide any support for its objection. Rather, Quadro contends that the other bids were lower because those bids were based upon "Avery prices that were appreciably long [sic] (presumably 'lower')". (Quadro's 56.1(b)(3) Stmt. ¶ 60.)

Two of the companies from which State Farm solicited bids, Xerox and Reign Graphics ("Reign"), were distributors of Avery products. (Avery's 56.1(a)(3) Stmt. ¶ 62.) In connection with Xerox's and Reign's preparation of bid proposals, Avery in turn gave Xerox and Reign quotes for Avery label products that could be sold to State Farm. (*Id.* ¶ 63.) It is undisputed that State Farm ultimately selected the distributor with the lowest bid, Reign, as its new vendor. (*Id.* ¶ 65.) State Farm claims that although it invited a bid from Quadro, it never gave any genuine consideration to retaining Quadro as its vendor. Specifically, State Farm claims that "even had Xerox and Reign not submitted bids" and "even had Plaintiff submitted a competitive bid, State Farm would not have continued to do business with Plaintiff." (*Id.* ¶¶ 68, 69.) In June of 1996, after all contracts between State Farm and Quadro had expired by their natural terms, Reign began providing Avery labels to State Farm. (*Id.* ¶ 70.)

On July 30, 1997, Plaintiff Quadro filed a three-count complaint against Defendants Avery and State Farm asserting the following: copyright infringement against Avery (Count I), copyright infringement against State Farm (Count II), breach of fiduciary duty against Avery (Count III). (Complaint, Ex. 1 to Avery's 56.1(a)(3) Stmt.)

On September 26, 1997, Defendant Avery moved to dismiss Count III on the basis that Plaintiff had alleged insufficient facts to establish a fiduciary relationship between the parties. On December 5, 1997, Judge Moran, who was then presiding over the case before its subsequent executive reassignment to this court,[5] granted Avery's motion and dismissed Count III. Concluding that the parties' relationship was not a joint venture, Judge Moran stated:

> Based on the facts plaintiff alleges, Avery was simply responsible for producing and printing the subject work at Quadro's behest, so that Quadro could sell the finished label sheets directly to State Farm. Nowhere does plaintiff indicate that Avery had any authority in the alleged joint venture of producing and selling label sheets to State Farm. To the contrary, the crux of plaintiff's claim is that Avery began producing and selling label sheets bearing Quadro's copyrighted subject work directly to State Farm without Quadro's authorization, indicating that Avery was in no way free to exercise independent control over the conduct of the enterprise.

*Quadro I*, 1997 WL 769345 at *3. Judge Moran further concluded that:

> Quadro's allegations are not enough to overcome the presumption that ordinary business transactions do not give rise to fiduciary obligations. . . . Quadro has merely alleged that it trusted Avery to fulfill its contractual obligations by producing the label sheets using the plates and tooling provided by Quadro, while keeping the production process confidential. This type of "normal trust" between businesses cannot transform a formal, contractual relationship into a fiduciary one. Quadro has not alleged the type of "close relationship" between business entities in which one "relies very heavily upon the judgment of another," that would give to a fiduciary relationship.

*Id.* at *4, citations omitted.

On January 5, 1998, Quadro moved to file an amended third claim. In a minute order

---

[5]     On October 26, 1998, the matter was reassigned to this court pursuant to an executive committee order. (Executive Committee Order, October 26, 1998, Docket # 72.)

dated February 4, 1998, Judge Moran granted Quadro's motion without explanation. On September 8, 1999, this court granted Quadro's motion to add tortious interference with economic relationship claims against Defendants Avery and State Farm (Count IV and Count V, respectively). *Quadro II*, 1997 WL 759488. Now before the court is Avery's motion for summary judgment on Count III (breach of fiduciary duty) and Count IV (tortious interference with economic relationship). Defendant State Farm has not joined Defendant Avery in its motion, nor has it moved separately for summary judgment on Count V.

## DISCUSSION

### 1.    Summary Judgment Standard

Summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(c). In considering such a motion, the court construes the evidence and all inferences that reasonably can be drawn therefrom in the light most favorable to the nonmoving party. *O'Connor v. DePaul University*, 123 F.3d 665, 669 (7th Cir. 1997). "A dispute over material facts is genuine if 'the evidence is such that a reasonable jury could return a verdict for the nonmoving party.' " *Kennedy v. Children's Serv. Soc'y*, 17 F.3d 980, 983 (7th Cir. 1994) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). The court will enter summary judgment against a party who does not "come forward with evidence that would reasonably permit the finder of fact to find in [its] favor on a material question." *McGrath v. Gillis*, 44 F.3d 567, 569 (7th Cir.1995).

## 2.    Count III - Breach of Fiduciary Duty

In Count III, Plaintiff Quadro asserts a cause of action against Avery for breach of fiduciary duty. To succeed on this claim, Plaintiff must show: (i) the existence of a fiduciary duty owed by Avery Dennison to Plaintiff; (ii) a breach of that duty; and (iii) an injury proximately resulting from the breach. *See, e.g., Sain v. Nagel*, 997 F.Supp. 1002, 1016 (N.D. Ill. 1998). Defendant Avery argues that (1) it did not owe a fiduciary duty to Quadro and (2) that Quadro cannot establish that its damages were proximately caused by any alleged breach. (Mem. In Support of Avery Dennison's Corp.'s Motion for Summary Judgment ("Avery's Mem.") at 5, 14.) In response to Defendant's motion, Plaintiff Quadro asserts that Avery owed it a fiduciary duty because Quadro and Avery were doing business as either a joint venture or partnership and that Avery breached this duty when it supplied price quotes for label products to Xerox and Reign. (Plaintiff's Memorandum in Response, and Objection to Avery Dennison's Motion for Summary Judgment ("Quadro's Resp.") at 1.)

"Under Illinois law, 'a joint venture is an association of two or more persons to carry out a single enterprise for profit, and the rights and liabilities of its members are tested by the same legal principles which govern partnerships.' " *Overseas Development Disc Corp. v. Sangamo Construction Co.*, 840 F.2d 1319, 1331 (7th Cir. 1988) (*quoting Smith v. Metropolitan Sanitary Dist.*, 77 Ill.2d 313, 318, 396 N.E.2d 524, 527 (1979). "The burden of proving a joint venture is on the person who claims such a relationship exists." *Barton v. Evanston Hosp.*, 159 Ill.App.3d 970, 973, 513 N.E.2d 65, 67 (1st Dist. 1987); *O'Brien v. Cacciatore*, 227 Ill.App.3d 836, 843, 591 N.E.2d 1384, 1389 (1st Dist. 1992). The existence of a joint venture may be

inferred from facts and circumstances showing that the parties in fact entered into such an enterprise.

> In general, the following elements are determinative of such an intent: (1) an express or implied agreement to carry on some enterprise; (2) a manifestation of intent by the parties to be associated as joint venturers; (3) a joint interest as shown by the contribution of property, financial resources, effort, skill or knowledge by each joint venturer; (4) some degree of joint proprietorship or mutual right to exercise control over the enterprise; and (5) provision for the joint sharing of profits and losses.

*Ambuul v. Swanson*, 162 Ill. App.3d 1065, 1068, 516 N.E.2d 427, 429 (1st Dist. 1987); *see also Gruca v. Alpha Therapeutic Corp.*, 19 F.Supp.2d 862, 872 (N.D. Ill. 1998) (*citing Fitchie v. Yurko*, 212 Ill.App.3d 216, 570 N.E.2d 892, 899-900 (2nd Dist. 1991).)

Joint venturers "stand in a fiduciary relationship to each other" and the relationship is governed by the legal principles applicable to partnerships. *Sharps v. Stein*, 90 Ill.App.3d 435, 413 N.E.2d 75 (1st Dist. 1980). As a general rule, a court must construe a partnership agreement as any other contract so as to determine the intent of the parties. *Saballus v. Timke*, 122 Ill.App.3d 109, 116, 460 N.E.2d 755, 759 (1st Dist. 1983). However, in determining the relationship of the parties under such an agreement, a court looks to the substance and not the form. *Id.*

Quadro contends that because the joint venture was memorialized in an express writing, a review of the "facts and circumstances" surrounding the alleged formation of the joint venture is unnecessary. In Quadro's view, the November 17, 1994 letter agreement is conclusive evidence that Avery and Quadro formed a joint venture. The court disagrees. Even if the November 17, 1994 letter constitutes an "express" partnership agreement, the

other indicia of a partnership or joint venture must be present. The following excerpt from

*Richton v. Farina*, 14 Ill.App.3d 697, 706, 303 N.E.2d 218, 224 (1st Dist. 1973), is instructive:

> [i]n addition to the requirement that a joint venture must have a contractual basis, either express or implied, we note that the decisions are in substantial agreement that the following factors must also be present: (a) a community of interest, (b) a proprietary interest in the subject matter, (c) a right to govern the policy in connection therewith, and (d) a sharing in both the profit and losses.

In short, the existence of an express agreement is just one of several factors courts consider when determining whether a joint venture exists. *See also Gruca v. Alpha Therapeutic Corp.*, 19 F.Supp.2d 862 (N.D. Ill.1998); *Fitchie v. Yurko*, 212 Ill.App.3d 216, 570 N.E.2d 892, 899-900 (2nd Dist. 1992); *cf. Ambuul v. Swanson*, 162 Ill.App.3d 1065, 1068, 516 N.E.2d 427, 429 (1st Dist. 1987) (although parties had signed written agreement, court nevertheless considered whether the other elements of a joint venture were present).

Defendant Avery argues that the parties never "agreed, intended, or manifested an intent to enter into a joint venture." (Avery Mem. at 7.) Specifically, Avery points out that the parties never agreed or discussed the following terms: the length of the alleged joint venture, the contribution that each party would make, the roles each party would fill, the ownership and distribution of assets, the events that would terminate the joint venture, the steps that the parties would need to take to withdraw from the joint venture or partnership, or how the parties would divide profits and losses. Avery contends that "this lack of discussion indicates the parties neither agreed nor intended to enter a joint venture." (Avery's Mem. at 7.)

Quadro emphasizes the November 17, 1994 letter agreement. As noted, the letter

opens with language referring to "the following partnership proposal" and concludes with a reference to "review and approval of this new partnership agreement." Pointing to the presence of the word "partnership" in the November 17 letter, Quadro urges the court to conclude its inquiry and hold that indeed a joint venture exists. But the court will not elevate form over substance. *Stanley Gudyka Sales Co. v. Lacy Forest Products Co.*, 686 F.Supp. 1301, 1305 (N.D. Ill. 1988) (despite a written agreement to share profits, evidence establishes the parties had no intent to create a partnership; the parties' relationship "may surely be manifested by what the parties did, not necessarily by the written Agreement alone.") Whereas the use of the word "partnership" militates in favor of a finding of a partnership or joint venture relationship, the parties' relationship is deficient of any other indicia of the intent to create a partnership or joint venture. For example, among other things, the letter does not purport to allocate a sharing of profits or control over the purported enterprise. Of the many factors to be considered when determining if a joint venture exists, courts attach significant weight to the sharing of profits and joint control elements. *Electrical Contractors, Inc. v. Goldberg & O'Brien Electric Co.*, 29 Ill.App.3d 819, 823, 331 N.E.2d 238, 243 (1st Dist. 1975).

Quadro and Avery did not even discuss any methods of sharing profits and losses, let alone actually share in any profits and losses stemming from the alleged joint venture. (Avery's 56.1(a)(3) Stmt. ¶¶ 30, 47.) Instead, Quadro asserts that the parties "understood" such sharing was impossible "at the joint venture level," and that they would instead "individually determine[] and enjoy whatever profit and loss resulted from their own

respective joint venture effort.") [6] (Amended Third Claim for Relief ¶ 35.) Even had Quadro

and Avery ever discussed this alleged "understanding," such "independent" generation of

individual profits is insufficient to satisfy the profit-sharing element of a joint venture. *See,*

*e.g., Shintom America, Inc. v. Cellular Info. Network, Inc.,* 825 F.Supp. 108, 112 (E.D. Va. 1993)

(profits accruing from the movement of goods from the manufacturer, through a distributor,

and to the ultimate consumer cannot be a sharing of the profits by the distributor); *see also*

*Inter-City Tire and Auto Center, Inc. v. Uniroyal, Inc.,* 701 F.Supp. 1120, 1126 (D.N.J. 1988),

*aff'd,* 888 F.2d 1382 (3rd Cir. 1982) (where Uniroyal sold Inter-City tires at a profit and Inter-

City resold the same tires at a profit, there was an anticipation of separate profits for each

party, which does not amount to a sharing of profits). "Illinois courts have long recognized

the distinction between 'profits as profits' and profits as the measure of compensation for

services." *Stanley Gudyka Sales Co.,* 686 F.Supp at 1305. To hold otherwise would result in

the unworkable conclusion that "every person, firm or corporation who furnishes material

or supplies in connection with an enterprise might be termed joint venturers, whether or not

they had any such intention." *Shintom,* 825 F.Supp. at 112.

Here, there simply is no evidence of profit or loss sharing between Quadro and Avery.

In fact, Avery billed Quadro for work it performed pursuant to purchase orders placed by

---

[6]    Plaintiff cites the Illinois Uniform Partnership Act, 805 ILCS 205/18, and *Seymour v. Williams,* 249 Ill.App.3d 264, 618 N.E.2d 966 (1st Dist. 1993), for the proposition that parties to a joint venture or partnership can agree to an *unequal* sharing of profits or control. The issue here, however, is not whether the parties must share profits or control *equally,* but whether there is sharing of any degree.

Quadro, and Quadro paid Avery for products it then sold to State Farm at a mark-up. When Quadro billed State Farm, the invoices were in Quadro's name, and State Farm's checks were payable to Quadro individually. This evidence strongly supports the conclusion that no joint venture exists as a matter of law. *See, e.g., Donohoe v. Consolidated Operating & Production Corp.*, 982 F.2d 1130, 1139 (7th Cir. 1992) (affirming summary judgment where "the plaintiffs offered no evidence that they and [defendants] agreed to share in losses"); *see also Nobelpharma Ab v. Implant Innovations, Inc.*, 930 F.Supp. 1241, 1256 (N.D. Ill. 1996) (no joint venture as a matter of law where parties do not share losses); *Hallmark Ins. Administrators, Inc. v. Colonial Penn Life Ins. Co.*, 697 F.Supp. 319, 326 (N.D. Ill. 1988), *aff'd*, 990 F.2d 984 (7th Cir. 1993) (finding no joint venture as a matter of law where "the contracts did not contemplate the sharing of profits and losses").

In determining whether a joint venture exists, courts look not only at whether profits and losses were shared, but also whether the parties exerted joint control over the joint venture. *See Secon Service System, Inc. v. St. Joseph Bank & Trust Co.*, 855 F.2d 406, 416 (7th Cir. 1988). Finding a right to manage or control requires finding some right by the parties to direct and govern the conduct of each other in connection with the joint venture. *See Edward Hines Lumber Co. v. Vulcan Materials Co.*, 861 F.2d 155, 158 (7th Cir. 1988); *see also Pinkowski v. Coglay*, 347 F.2d 411, 413 (7th Cir. 1965). Other factors relevant to the issue include whether the parties manage their own affairs separately, whether they appoint persons to management positions within the joint venture, whether they control the methods or policies used by each other, whether they exert or attempt to exert control over the work

of the joint venture, and whether any right to control is one-sided rather than mutual. *See, e.g., O' Brien v. Cacciatore*, 227 Ill.App.3d 836, 591 N.E.2d 1384, 1388-89 (1st Dist. 1992); *Electrical Contractors, Inc. v. Goldberg & O'Brien Elec. Co.*, 29 Ill.App.3d 19, 331 N.E.2d 238, 242 (1st Dist. 1975).

In *Edward Hines Lumber Co.*, the Seventh Circuit affirmed the conclusion that plaintiff Hines, an owner and operator of a wood treatment facility, and the defendant, a chemical supplier, were not joint venturers, noting:

> [Defendant] had no control of the work at the Hines plant, no right to choose employees, direct their activities, or set prices; it had at most a limited veto power -- if the product was not up to snuff. . . . Hines could have shut the plant or revamped its operation in order to reduce emissions; [Defendant] could not require Hines to do either.

861 F.2d at 158. Here, similarly, there is no evidence that either Quadro or Avery had the right to direct the other's conduct in connection with the sale of the labels to State Farm. Avery had no right to set the price of the labels sold to State Farm or to direct Quadro's activities. Avery was not party to, nor did it participate in, negotiating Quadro's contracts to sell label products to State Farm, nor did those contracts mention Avery or require that Avery label products be used. Quadro had control over the distribution of the product; Avery's role was limited to filling purchase orders it received from Quadro. Because Quadro cannot prove that the parties shared the requisite joint control, no joint venture exists as a matter of law. *O'Neil v. Continental Ill. Nat'l Bank & Trust Co.*, No. 84 C 9398, 1985 WL 2710, *10-11 (N.D. Ill. Sept. 25, 1985) (granting summary judgment where plaintiffs could not establish right to direct and govern the project or sharing of profits and losses); *Ryan v. Wersi*

*Electronics GmbH & Co.*, 3 F.3d 174, 181 n. 4 (7th Cir. 1993) (no joint venture existed where there was no showing of joint control or sharing in profits and losses; rather, plaintiff was to have exclusive distribution rights of defendant's product).

Absent a joint venture relationship, there is no basis for Quadro's claim that Avery owed fiduciary duties to it. Avery's motion for summary judgment on Count III is granted.

3.    **Count IV - Tortious Interference with Economic Relationship**

In this court's September 8, 1999 opinion, this court summarized Avery's tortious interference with economic relations claim as follows:

> In conjunction with Avery, Quadro had a relationship with State Farm by virtue of its contracts and ongoing negotiations, and expected this relationship to continue. Avery intentionally interfered by providing prices and offering label products to State Farm through Xerox and Reign and as a result, Quadro lost the State Farm business.

*Quadro II*, 1999 WL 759488, *4.

Illinois recognizes two torts under the label of interference with economic relations, both of which are arguably alleged by Quadro: tortious interference with contractual relations and tortious interference with prospective business relations. *Olaf v. Christie Clinic Ass'n*, 200 Ill.App.3d 191, 195, 558 N.E.2d 610, 613 (4th Dist. 1990). Although the Illinois Supreme Court has never explicitly set out the elements of tortious interference with contractual relation, it is generally recognized in Illinois that a plaintiff bears the burden of proof on each of the following elements:

> (1) the existence of a valid and enforceable contract between plaintiff and another; (2) the defendant's awareness of this contractual relation; (3) the defendant's intentional and unjustified inducement of a breach of that contract;

(4) the subsequent breach by the others, caused by the defendant's wrongful conduct; and (v) damages.

*Id.; see also HPI Health Care Servs., Inc. v. Mt. Vernon Hosp., Inc.*, 131 Ill.2d 145, 156, 545 N.E.2d 672, 676 (1989). The elements of a claim for tortious interference with prospective business relations include:

> (1) [plaintiff's] reasonable expectation of entering into a valid business relationship; (2) the defendant's knowledge of the plaintiff's expectancy; (3) purposeful interference by the defendant that prevents the plaintiff's legitimate expectancy from ripening into a valid business relationship; and (4) damages to the plaintiff resulting from such interference.

*Fellhauer v. City of Geneva*, 142 Ill.2d 495, 511, 568 N.E.2d 870, 878 (1991); *see also Canel & Hale, Ltd. v. Tobin*, 304 Ill.App.3d 906, 918, 710 N.E.2d 861, 872 (1st Dist. 1999).

The essential distinction between the two torts is that the former requires proof of enforceable contracts between Quadro and State Farm, while the latter requires only a reasonable expectancy of future economic advantage from the relationship. *See Belden Corp. v. InterNorth, Inc.*, 90 Ill.App.3d 547, 552, 413 N.E.2d 98, 101 (1st Dist. 1980). "The torts are also distinguishable in that, under Illinois law, greater protection is afforded to contract rights than is afforded to prospective business relationships." *E.J. Brach Corp. v. Gilbert Int'l, Inc.*, 90 C 1399, 1991 WL 148914, \*6 (N.D. Ill. June 18, 1991) (*quoting Belden*, 90 Ill.App.3d 547, 413 N.E.2d 98, 101-01 (1st Dist. 1980)).

## A.    Tortious Interference with Contractual Relations

With respect to the interference with contractual relations claim, Defendant Avery moves for summary judgment arguing that "there was no breach of contract for Avery

Dennison to have induced." (Avery's Mem. at 15.) Specifically, Avery contends that the contract between Quadro and State Farm expired pursuant to its natural terms, and not on the account of Avery's alleged interference. (*Id.*) Moreover, Defendant Avery argues the Quadro's claim must fail because Quadro cannot prove that any alleged interference resulted in its alleged damages. (*Id.*)

It is well established that in order to succeed on a claim for tortious interference with contractual relations, the party making the claim must demonstrate that there was a contract and that it was breached. *Goldberg v. Miller*, 874 F.Supp. 874, 879 (N.D. Ill.1995); *see also Futurevision, Inc. v. Dahl*, 139 Ill.App.3d 61, 66, 487 N.E.2d 127, 131 (1st Dist. 1985) (affirming summary judgment on tortious interference with contract claim where contract was not breached but, rather, not extended pursuant to the contract's right of first refusal clause); *Voutiritsas v. Intercounty Title Co.*, 279 Ill.App.3d 170, 187, 664 N.E.2d 170, 181 (1st Dist. 1996) (affirming summary judgment on tortious interference with contract claim where breach occurred before defendant's alleged conduct); *National Educational Advertising Service, Inc. v. Cass Student Advertising, Inc.*, 454 F.Supp. 71, 73 (N.D. Ill.1977) ("There having been no subsequent breach, a necessary element of the tort is lacking.")

In *Pfendler v. Anshe Emet Day School*, 81 Ill.App.3d 818, 401 N.E.2d 1094 (1st Dist.1980), a teacher sued the private school she had worked for claiming breach of contract, and its director for wrongful inducement of breach of contract. The court ruled that the school had not breached its contract with the teacher because she was discharged in accordance with the applicable terms of the contract (i.e. "the specified procedures for causes

of discharge, for termination, for tenure rights, and for grievances, including the finality of the decision of the Board of Trustees or its designated committee"). 81 Ill.App.3d at 824, 401 N.E.2d at 1097. As for the teacher's claim that the director had made false charges of incompetency against her causing the school to unjustifiably terminate her employment, the appellate court stated:

> [T]he rights of plaintiff and defendant [director] Nathan are governed by the result above reached that there has been no breach of the contract between plaintiff and the defendant school. . . . Since there was no breach of the contract to which plaintiff was a party, it follows necessarily that defendant Nathan could not conceivably be guilty of inducing a breach of contract.

*Pfendler*, 81 Ill.App.3d at 824-25, 401 N.E.2d at 1098.

Similarly in the instant case, Quadro's contractual relations with State Farm terminated not on the account of any alleged interference, but rather, pursuant to the applicable terms of the contract. The State Farm/Quadro contract simply expired. Indeed, Plaintiff admits that State Farm "failed and refused to renew or extend Plaintiff's Return Address or Holiday Label contracts with Plaintiff and let same expire." (Quadro's 56.1(b)(3) Stmt. ¶ 70.) Consequently, because there was no breach of contract, Plaintiff's tortious interference with contractual relations claim must fail.

## B.     Tortious Interference with Prospective Business Relations

In order to succeed on a tortious interference with prospective economic advantage, it is not necessary for Quadro to show there was a breach of an existing contract. Instead, Quadro must show that it had a reasonable expectation of entering into or continuing its business relationship with State Farm and that Avery purposefully interfered preventing the

relationship from ripening into a valid business relationship. Quadro claims that "if Avery had not solicited State Farm with low prices through Reign in mid February 1996, State Farm would have continued its [] relationship with Plaintiff and accepted Plaintiff's 1996 pricing on the Return Address label. Quadro's 'expectancy' and future relations was thus a virtual certainty." (Quadro's Opp'n to Summ. J. at 22.) Avery argues that Quadro's claim must fail in that Quadro did not have a reasonable expectation of continuing or renewing its existing relationship with State Farm. (Avery's Mem. at 17.) Avery also argues that, even if Quadro had a reasonable expectation, Avery's actions did not improperly interfere with Quadro's expectations. (*Id.*)

The pivotal issue of whether or not Quadro had a reasonable expectancy of future State Farm business was previously discussed in the court's earlier opinion addressing Quadro's motion to amend the complaint. In response to Avery's motion, and in support of a finding that there was an "expectancy", Quadro directs the court's attention to the passage where the court wrote:

> In this court's view, Quadro's allegation of a reasonable expectation of continued business is sufficient, under a notice pleading standard, to survive a motion to dismiss. Quadro has alleged contacts with State Farm that are not insubstantial: existing contracts with State Farm, an invitation to bid, as well as development and testing of other label sheet programs for State Farm. These allegations are adequate, at least at this stage, to support the conclusion that Quadro had more than a "mere hope" of a continued business relationship with State Farm.

Notably, the court was operating under the liberal notice pleading requirement, using the motion to dismiss standard. *Quadro II*, 1999 WL 759488, *7. Moreover, in the same opinion,

the court also cautioned that "the landscape may change dramatically on summary judgment, where the court may address fact-based issues, such as whether State Farm really was willing to do business with Quadro into the future." *Id.*

An analysis of the facts shows that Quadro's expectation was not reasonable. First, the contracts between Quadro and State Farm expired by their own terms in March and May of 1996 and did not provide for any right or expectancy of renewal. (Avery's 56.1(a)(3) Stmt. ¶¶ 51-53.) Furthermore, there is no evidence that Quadro and State Farm engaged in any negotiations over the contracts. Quadro merely received an invitation to bid on the label business. The fact that Quadro was asked to bid implies that the contract was up for competitive bidding and thus it cannot be said that Quadro had an expectancy of future business relations. Lastly, according to Plaintiff's own allegation in Count V, State Farm was going to great lengths to avoid entering into another contract with Quadro, including seeking competitive bids "at a lower price," and "falsely and maliciously" misrepresenting to Avery that Avery would not retain State Farm's label business if Plaintiff continued to be Avery's distributor. Thus, any expectancy Quadro had of entering into a prospective relationship with State Farm was nothing more than a mere hope. Plaintiff's contracts with State Farm were expiring and State Farm put the business up for bid. As a matter of law, Plaintiff had no reasonable expectation of continuing its relationship with State Farm and thus the court grant Avery's motion for summary judgment with respect to Count IV.

## CONCLUSION

For the reasons stated herein, the court grants Defendant Avery's motion for summary judgment on Counts III and IV.

ENTER:

Dated: July 25, 2000

REBECCA R. PALLMEYER
United States District Judge

(g:\quadct34)